**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Steve M., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | No. 18 CV 50412 |
| | ) | Magistrate Judge Lisa A. Jensen |
| Andrew Marshall Saul, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| *Defendant*. | ) | |

**MEMORANDUM OPINION AND ORDER[1]**

Plaintiff stopped working in June 2014. Six months later he applied for Title II Social Security disability benefits, alleging that his back problems and other problems from his chronic obstructive pulmonary disease ("COPD") made it too difficult to work full-time. Plaintiff's main contention for why he can't work is that he lacks stamina. Counsel emphasized this point at the hearing, arguing that Plaintiff's claim was more about "an inability to sustain work, as opposed to an inability to perform certain work at certain levels." R. 43.

That hearing was held in February 2017. Plaintiff and a vocational expert testified. No medical expert testified. Nine months later, the administrative law judge ("ALJ") issued an 11-page decision finding Plaintiff not disabled. At Step Two, the ALJ found that Plaintiff had three severe impairments—the back problem (described as "degenerative disc disease with radiculopathy, post lumbar spine fusion"), COPD, and peripheral arterial disease. The ALJ found that Plaintiff's affective disorder and hypertension did not qualify as severe impairments. At Step Three, the ALJ found that Plaintiff did not meet Listings 1.02, 3.02, and 12.04. Plaintiff does not

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings pursuant to 28 U.S.C. § 636(c).

1

challenge these two findings. In the RFC analysis, the ALJ found that Plaintiff could do modified light work.

At the start of the RFC analysis, the ALJ provided an overview of his major conclusions. This summary is worth quoting:

> The treatment records indicate significant impairments, but clinical findings do not support the degree of limitations alleged. The records support pulmonary limitations, but they are not at listing level, and do not preclude all work activities. At times, they were described as severe, but at most times they were described as mild or moderate. On most occasions, the physical examinations were not as severe as the symptoms described by claimant. Similarly, while claimant does have descriptions of disc disease and other musculoskeletal issues, the descriptions are not consistent. Further, while claimant's treating physician, Aaron Coates, M.D., provided medical course statements that would preclude work (discussed below) his and other physician's notes do not support the disabling nature of claimant's condition.

R. 25. The ALJ then set forth a chronological summary of the medical visits, beginning with a doctor's visit on October 31, 2013 and concluding with a visit in May 2016. This summary is two-thirds of a page. The short nature of this summary is ostensibly consistent with either side's theory of the case. Plaintiff claims the that ALJ failed to consider key facts while the Commissioner argues that the ALJ rightly found little objective evidence to show that Plaintiff's conditions were severe or that his treatment was commensurate with such an allegation.

The ALJ next analyzed the medical opinions. The bulk of the analysis centered on Dr. Aaron Coates, Plaintiff's primary care physician.[2] He provided two opinions, but the second one is the critical one here. It is really a series of separate questionnaires all completed by Dr. Coates on April 22, 2016. *See* Ex. 13F. The gist of this collective opinion is that Plaintiff had limitations that would prevent him from working full-time. The ALJ gave limited weight to this opinion

---

[2] The ALJ also discussed the opinions of the State agency physicians and the consultative examiners. However, neither side argues that these opinions materially affect the analysis here.

based on, depending how you count them, either two or three rationales. The ALJ's reasoning was as follows:

> Only some weight is given to Dr. [Coates's] various opinions, for several reasons. In exhibit 13F his opinion was internally inconsistent, saying claimant had moderate limitations in attention and concentrating, but then noting no effect. More importantly, his own treatment record[s] do not support the extreme opinions given. For example, see the relatively normal physician examination performed in April 2016 (Ex. 16F at 7). There, claimant was noted to be positive for back pain and tingling, but had an otherwise normal examination. These opinions are also inconsistent with the consultative examination, discussed above, that found minimal abnormalities. Dr. [Coates] apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, as opposed to his own examination [findings], and seemed to uncritically accept as true most, if not all, of what the claimant reported.

R. 27. Plaintiff argues all these rationales are flawed.

The next relevant portion of the decision is the credibility analysis. It consists of two paragraphs. The first one summarizes the seven factors that should be considered according to 20 CFR §§ 404.1529 and 416.929.[3] The second paragraph sets forth three rationales. Here is that analysis, quoted in full:

> The claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. He reported to the consultative psychologist that he resides alone, is able to complete basic household chores, prepare his own meals and do grocery shopping. (Ex. 8F). Additionally, the claimant has not generally received the type of medical treatment one would expect for a totally disabled individual. Although the claimant has received treatment for the allegedly disabling impairments, that treatment has been essentially routine, intermittent, and conservative in nature. Moreover, there is an absence of treatment records in the past year—which suggests that his symptoms were not significant enough to warrant continued treatment. Although the claimant's medical testing indicates that he may experience some shortness of breath, it has not been shown to be to the level that would prevent light or sedentary work.

---

[3] As summarized by the ALJ, these factors are: "(i) daily activities; (ii) the location, duration, frequency, and intensity of pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (v) treatment, other than medication, received for relief of pain or other symptoms; (vi) any measures used to relieve your pain or other [sic]; and (vii) other factors concerning functional limitations and restrictions due to pain or other symptoms." R. 27.

R. 27-28. Plaintiff also argues that all these rationales are flawed.

## DISCUSSION

Plaintiff's opening brief individually attacks each of the rationales quoted above. But a larger criticism running throughout these arguments is the claim that the ALJ repeatedly overlooked evidence supporting Plaintiff's case. *See Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012) (finding that ALJs should not ignore contrary lines of evidence). In short, Plaintiff accuses the ALJ of cherry-picking.

The Commissioner argues that the ALJ's rationales were all valid. However, it is important to note right at the outset that the Commissioner's predominant strategy, whether explicitly labelled as such, is a harmless error approach.[4] The Commissioner's general *modus operandi* is to bolster and strengthen the ALJ's rationales by providing additional evidence and additional arguments and explanation to patch over thin spots in the ALJ's analysis. Plaintiff describes these arguments as "*post hoc* rationalizations." Dkt. #26 at 6. But the problem with this approach is that it runs into the *Chenery* doctrine, which "forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced." *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). As a result, the Commissioner's arguments must be evaluated under the stricter harmless error doctrine rather than under the more deferential substantial evidence standard. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (finding that the harmless error doctrine applies when the court can conclude with great confidence that the ALJ would reach the same conclusion absent the error). Another difficulty in assessing harmless error

---

[4] In most instances, the Commissioner does not characterize or label its arguments as harmless error arguments, but that is what they are in essence.

arguments is that they often force this Court to make a first-level assessment of the medical evidence, an assessment that must be made without the benefit of calling a medical expert.

Despite these concerns, the harmless error doctrine remains a possible avenue for affirming an ALJ's decision that contains some shortcomings. However, in this Court's view, the harmless error doctrine is most appropriate where it is used to fix relatively small or isolated errors, but less appropriate when those errors are more numerous or significant and would therefore require a more time-consuming rehabilitation project. In this latter scenario, it makes more sense to err on the side of remanding so that a more comprehensive review can be conducted at the administrative level where, if need be, the record may be developed with the assistance of a medical expert. This Court finds that this is such a case. Although the ALJ's decision does not contain a single large or glaring error, it contains enough smaller errors that cumulatively reach a tipping point. Because this Court concludes that a remand is warranted, it will not attempt to definitively resolve all the issues raised in the briefs but will instead highlight the major reasons for its decision.

**Objective Evidence.** The central rationale in the ALJ's decision is the claim that the objective medical evidence supporting Plaintiff's allegations is sparse. As quoted above, the ALJ asserted that Plaintiff's symptoms were either mild or non-existent on "most occasions," and that he had "relatively normal" examinations at some doctor visits. R. 25, 27. The paucity of the objective evidence led the ALJ to surmise that Dr. Coates's opinion must have been based heavily on Plaintiff's subjective reports. Plaintiff argues that this assessment was based on a cherry-picked review of the record. Plaintiff also argues that the assessment failed to consider the waxing and waning nature of his symptoms, a fact that would explain why there were some normal findings. *See, e.g., Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("A person who

5

has a chronic disease [] is likely to have better days and worse days[.]"). This Court agrees that the ALJ insufficiently considered these issues.

To support these contentions, Plaintiff identifies pieces of evidence overlooked by the ALJ. This evidence includes examination findings, such as positive FABER and Patrick's testing on the right side, and treatments, including lumbar steroid injections, trigger point injections, and the "prescription of analgesics, NSAIDS, muscle relaxants, and narcotic pain relievers." Dkt. #19 at 7. Plaintiff's brief contains citations to the record to support these points, and Plaintiff claims that the ALJ "mentions essentially none of [this] evidence." *Id.* Regarding Dr. Coates's opinion, Plaintiff complains that the ALJ only relied on the notes from a "single examination" and ignored a "plethora of abnormal findings." *Id.*

In its response brief, as noted above, the Commissioner attempts to counter Plaintiff's narrative by basically bringing more firepower to this battle over whether the normal or abnormal findings were on balance greater. With regard to Dr. Coates, the Commissioner cites to "[o]ther records" where he found that Plaintiff had "largely normal examination findings." Dkt. #25 at 5. The Commissioner then includes a long list of record citations (over 15 by this Court's count). In other words, in contrast to the ALJ who provided only one example of inconsistency, the Commissioner has provided more than 15. Quite the upgrade. This same pattern occurs with other issues. As for the pulmonary problems, the Commissioner again cites to "other records." Dkt. #25 at 8. In this instance, the Commissioner provides 17 record citations showing that, in the Commissioner's view, the pulmonary problems were not significant. *Id.* As for the musculoskeletal issues, the Commissioner provides 7 new citations to shore up the ALJ's conclusions. *Id.* But insofar as this Court can determine, the ALJ did not cite to most of this

6

evidence himself. *See* R. 25. Thus, whether or not this new evidence is ultimately persuasive, the basic fact remains that most of this evidence was not explicitly relied on by the ALJ.[5]

In addition to providing more evidence to support the ALJ's conclusions, the Commissioner adds more analysis and argument. For example, in response to Plaintiff's criticism that the ALJ only gave one example to support the claim that Dr. Coates's opinion was inconsistent with his treatment notes, the Commissioner explains that the ALJ did not willy-nilly pick out a "randomly chosen" example, but instead carefully chose a key example, which was the treatment notes from the day the opinion was rendered. Dkt. #25 at 4. The Commissioner thus proffers a "contemporaneous" verification theory in which the examination findings from the day the opinion was rendered are given more weight in the overall calculus. Such a theory is not inherently unreasonable.[6] But the first issue is not whether this theory is persuasive, but whether the ALJ actually relied on it. There is little concrete evidence to suggest that he did.

Consider another example. Plaintiff complains that the ALJ failed to discuss his vertebral compression fracture. The Commissioner does not dispute the claim but argues that this evidence was not significant. Here again, the Commissioner comes up with a new argument not relied on by the ALJ.[7] It is important to emphasize that this Court's decision to remand is based on the collective force of all these omissions. If the compression fracture were the only example, then

---

[5] Moreover, Plaintiff argues in his reply brief that the Commissioner's long lists are padded with irrelevant normal findings not connected to impairments at issue. *See* Dkt. #26 at 2 (*e.g.* lack of a rash). The Commissioner, for its part, believes that Plaintiff's citations are one-sided and cherry-picked.
[6] At the same time, one might raise the counter-objection that this theory ignores the importance normally given to the longitudinal record. Imagine if the shoe were on the other foot, and Plaintiff had a severe symptom flare-up on the day Dr. Coates provided the opinion, but then had few symptoms at the other visits. Would the Commissioner then agree that this evidence should carry the day?
[7] The argument is based on the doctor's instruction that Plaintiff should "avoid sports that required sudden body movements" because of the fracture. Dkt. #25 at 6 (citing R. 346). The Commissioner argues that these instructions were consistent with the ALJ's RFC.

this Court could affirm the ALJ's decision under the general rule that an ALJ need not address every piece of evidence. *See Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020).

There is one final issue to be noted in this category of objective evidence. Neither side focused much on the pulmonary testing. In this Court's view, this evidence deserves a closer look, especially since it is considered to be objective evidence. The ALJ only briefly mentioned some of this evidence in the following statement:

> Objective medical testing from December 2014 indicates a FEV1/FVC ratio of 50% with a lung capacity of 105 and residual volume of 127. The claimant was also noted to have obstructive pulmonary disease and moderate to severe air trapping.

R. 26 (internal citations omitted). This statement was included in the chronology of the medical evidence but was not later mentioned in the analysis. As an initial matter, this statement provides at least some objective evidence supporting Plaintiff's allegations, thus partially rebutting the notion that Dr. Coates only relied on Plaintiff's subjective statements. Second, the ALJ's summary omits the fact that Dr. Abdullah Altayeh, who saw Plaintiff after these pulmonary tests, categorized Plaintiff's COPD as "severe." R. 533, 541. Third, the ALJ did not mention that, after these tests, Plaintiff had at least two more such tests, one in March 2015 and one in February 2016. In the March 2015 test, Plaintiff's FEV1/FVC ratio was 45%, a slight worsening from the 50% number from the previous test. R. 540-41. The February 2016 test also indicated that the FEV1/FEC ratio was 45%. R. 643.

As for whether Plaintiff's condition was worsening, the ALJ did not squarely address this issue but made one comment at the end of the medical chronology suggesting that he doubted Plaintiff's testimony. Specifically, the ALJ wrote: "In April 2016, the claimant complained of worsening COPD, but it was noted that his problems were controlled (Ex. 16F at 5)." R. 26. This statement is problematic for several reasons. First, it fails to acknowledge the very recent

8

pulmonary test that appears to show Plaintiff's condition had worsened somewhat since the December 2014 test. Second, the statement seems to have misread the treatment notes which state that it was Plaintiff's high blood pressure—*not the COPD*—that was then being controlled. *See* R. 644 ("**Hypertension**: This is a chronic problem. The current episode started more than 1 year ago. The problem has been gradually worsening since onset. *The problem is controlled*.") (emphasis added). But these notes do *not* state that the COPD problem was controlled. They indicate that his problems were continuing, albeit with some waxing and waning and with some moderate benefit from various treatments being tried. *See* R. 645. In sum, this statement is another reason why a deeper analysis is needed.

    **Daily Activities.** Plaintiff argues that the ALJ engaged in cherry-picking when assessing his daily activities. Although this not an egregious example, the Court agrees that the ALJ failed to consider all the relevant facts. This conclusion is demonstrated by a simple comparison. First here is what the ALJ wrote:

> The claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. He reported to the consultative psychologist that he resides alone, is able to complete basic household chores, prepare his own meals, and do grocery shopping (Ex. 8F).

R. 27. Second here is the source material the ALJ relied on, which is the description of Plaintiff's daily activities as summarized by Dr. Dianna Kucera, the psychological consultative examiner:

> The claimant [] currently resides alone. **The claimant reported that his friend assists him with lawn maintenance, vacuuming and some of the household chores he is unable to complete.** The claimant is able to complete basic household chores. The claimant is able to prepare his own meals and do the grocery shopping. **If he has to pick up a lot of groceries he brings someone with him to assist him. The claimant is able [to] tend to his own grooming and hygiene.**

R. 561 (emphasis added). The portion the Court has bolded was left out of the ALJ's summary, but this part is favorable to Plaintiff. The ALJ should have acknowledged this evidence. *See*

9

*Lambert v. Berryhill*, 896 F.3d 768, 777-78 (7th Cir. 2018) (faulting the ALJ who "overread or overlooked important evidence in discrediting [the claimant's] testimony about his limited activities of daily living" by relying on one part of a treatment note but then "gloss[ing] over" another part).

The Commissioner does not challenge the cherry-picking accusation. Instead, it argues that the omitted facts were not material. It argues that "[m]owing the lawn [] would require a level of exertion beyond light work" and "[c]arrying large loads of groceries would exceed the restriction to occasional lifting of no more than ten pounds." Dkt. #25 at 10. This is another after-the-fact explanation. If this error were considered in isolation, then the Court might be willing to agree with the Commissioner's analysis, assuming the other parts of the ALJ's decision were solidly grounded. Although both sides go back and forth on this question of daily activities, this topic does not appear to offer compelling evidence for either side's position.

**Conservative Treatment.** This was another credibility rationale. The ALJ's entire discussion was the following: "Additionally, the claimant has not generally received the type of medical treatment one would expect for a totally disabled individual." R. 27. There was no further discussion beyond this statement. Plaintiff complains that the ALJ failed to acknowledge various treatments he tried, including pain medications and injections. Plaintiff also complains that the ALJ failed to indicate "what further treatment might be indicated for his lower back pain that he has not already undergone." Dkt. #19 at 10. Plaintiff has again raised valid objections. *See* SSR 16-3p; *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (finding that an ALJ should explore possible explanations for why treatments were not pursued).

The Commissioner again attempts to fix the problem by supplying the missing analysis. The Commissioner argues that Plaintiff did not seek treatment "often" during the relevant period

10

and argues that pain medications were "a conservative way to address back pain." Dkt. #25 at 10. The Commissioner further argues that Plaintiff "reported to healthcare providers that the medication was generally effective." *Id.* at 11. The latter rationale was not specifically mentioned by the ALJ.

In general, the ALJ provided little discussion about treatments. The ALJ never mentioned *any* of the medications Plaintiff was taking. According to treatment notes from the April 2016 visit with Dr. Coates, Plaintiff was then taking Proair HFA, aspirin, Lipitor, Celexa, Klonopin, Flexeril, Dilacor XR, Advair, Spiriva Respimat, Ultracet, EC-Naprosyn, Zanaflex, and Ultram. R. 645-46. Perhaps the Commissioner is correct in its suggestion that these were essentially routine, low-maintenance medications consistent with the finding of conservative treatment, but this conclusion should be explained and supported by medical authority. By not even acknowledging these medications, the ALJ leaves doubt as to whether he was fully aware of them.

Although medications appear to have been the main form of treatment, Plaintiff also tried other treatments. But the factual record is not fully developed on this issue either. Plaintiff testified that he went to a pain clinic at one point, but was not allowed to stay in the program because he tested positive for marijuana. R. 52. Plaintiff stated that he tried a TENS unit and a nebulizer. *See* R. 97, 281. Plaintiff already had a history of lumbar spine fusion at L5-S1. R. 350. He later consulted with a surgeon about further surgery. R. 371. None of these facts were acknowledged by the ALJ. These facts should also be considered in the analysis so that this Court can follow the ALJ's path of reasoning.[8]

---

[8]Although the parties did not discuss this fact in their briefs, Dr. Altayeh wrote in his treatment notes in February 2016 that Plaintiff had an "LVRS evaluation at UW" but was "not a candidate at this time." R. 642. According to medical websites, LVRS stands for "lung volume reduction surgery" and is apparently sometimes used to treat COPD patients with more severe problems. This fact that Plaintiff was not a

11

**Treatment Gap.** Another credibility rationale was that Plaintiff had not sought much treatment in the past year. Plaintiff argues that the ALJ never explored, as he was required to do, possible reasons for this treatment gap. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). In this one instance, the Commissioner directly asks this Court to apply the harmless error doctrine. The Commissioner argues that, although Plaintiff testified that he lost his insurance when he quit his last job, he further testified that "he was trying to find out if additional pulmonary rehabilitation therapy would be covered by the state, indicating he had state-provided medical coverage." Dkt. #25 at 11. The Court does not find this argument overly persuasive, but the record is not fully developed. Even if Plaintiff had some state-provided coverage, he might still have had problems accessing it in a timely or consistent manner.

**Internal Inconsistency in Dr. Coates's Opinion.** Finally, the Court addresses the ALJ's rationale that Dr. Coates's April 2016 opinion was internally consistent because on one form he checked a box indicating that Plaintiff's concentration and attention problems were moderate but on a separate form indicated, in answers to a series of specific questions, that Plaintiff's problems in this area were not significantly limiting. *Compare* R. 627 *with* R. 629-30. The ALJ found that this apparent contradiction was a reason to disregard the doctor's opinion.

Plaintiff argues that the answers can be reconciled based on the specific way the questions were worded. The Commissioner responds that the ALJ "was not obliged to imagine a way to read the forms as consistent." Dkt. #25 at 4. For this argument, the Commissioner basically relies on the ALJ's original rationale, and is thus not making a *de facto* harmless error argument. Based on these arguments, the Court cannot conclude that the ALJ's reasoning was

---

candidate at this time may undermine his claims, but perhaps the mere fact he was being considered for this type of surgery supports his claim that the COPD was severe and worsening. This issue can be explored on remand with a medical expert.

unreasonable because an inconsistency is a valid factor to consider. *See, e.g., Burmester v. Berryhill*, 920 F.3d 507, 512 (7th Cir. 2019) ("The [doctor's] assessment, consisting of a series of checked boxes, was internally inconsistent."). Still, the contradiction in this case was so stark that it raises the question whether the doctor simply misread the instructions or made a clerical mistake. As Plaintiff notes, a better way to address this anomaly would have been to re-contact Dr. Coates and seek clarification. Such an effort should be made on remand.

In sum, the Court finds that the ALJ's decision contains too many unexplored or unanswered questions to affirm under a harmless error analysis. In remanding this case, the Court is not indicating that Plaintiff will necessarily prevail on remand, nor is the Court suggesting that the additional arguments and evidence offered by the Commissioner would be unpersuasive if they had been adopted by the ALJ in the first instance.[9]

## CONCLUSION

For these reasons, Plaintiff's motion for summary judgment is granted, the Commissioner's motion is denied, and the case is reversed and remanded to the Commissioner for further proceedings consistent with this Opinion.

Date: July 31, 2020    By: _____
Lisa A. Jensen
United States Magistrate Judge

---

[9] Late in the briefing process, the parties got into a debate about whether the "patently wrong" credibility standard is still good law in light of SSR 16-3p. Plaintiff first raised this argument in his reply brief, which led the Commissioner to file a sur-reply. The Court need not analyze this question to resolve the current arguments. But the Court does generally note that the Seventh Circuit has continued to cite to the "patently wrong" standard in very recent cases. *See, e.g., Apke v. Saul*, __ Fed. App'x. __, 2020 WL 4018988, *4 (7th Cir. July 16, 2020).